# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

HUNG QUOC NGUYEN,

        Plaintiff,

    v.

JEFF MACOMBER,

        Defendant.

Case No. 15-cv-00228-BLF

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

      Hung Quoc Nguyen, a state prisoner represented by counsel, filed an amended petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his state criminal conviction of six counts under (1) California Penal Code § 187(a) (murder), (2) §§ 182(a)(1) and 187 (conspiracy to commit murder, (3) §§ 182(a)(1), 12034(c), and 245(a)(1) (conspiracy to commit a shooting from an occupied vehicle and an assault with a deadly weapon), (4) § 12034(c) (shooting from a motor vehicle), (5) § 186.22(a) (street terrorism); and (6) § 246 (shooting at an occupied vehicle). Am. Pet. ("Pet."), ECF 21. Petitioner asserts seven claims of constitutional violations. Respondent filed an answer, addressing the merits of Petitioner's claims, and exhibits in support thereof. ECF 24, 24-1, 25-31. Petitioner filed a traverse in response. ECF 38. Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief and DENIES the amended petition for writ of habeas corpus.

## I. BACKGROUND

      In 2010, Petitioner was tried and convicted in Contra Costa County Superior Court. A jury found Petitioner guilty of the six counts charged. 3 Clerk's Transcript on Appeal ("CT") 675-690, Ex. 1 to Answer, ECF 25-1. The charges also included enhancements for firearm use (§ 12022.53) and street gang association (§ 186.22(b)). *Id.* at 675-689. On February 10, 2012, the

trial court sentenced Petitioner to an aggregate prison term of 73 years to life.  6 CT 1634-1635.

Petitioner appealed and, on September 5, 2013, the California Court of Appeal issued a written opinion denying relief and affirming the judgment in part.[1]  Ex. 8 to Answer, ECF 31-7 (Ct. App. Decision).  On December 11, 2013, the California Supreme Court denied Petitioner's petition for review.  Ex. 10 to Answer, ECF 31-8.

Petitioner initiated this case pro se on January 15, 2015.  ECF 1.  On May 21, 2015, Petitioner moved through counsel to file an amended petition, and the Court later granted the motion.  ECF 15, 16.  On July 30, 2015, Petitioner filed a motion to hold the federal petition in abeyance so he could exhaust additional claims based on recent decisions of the California Supreme Court and the California Court of Appeal, which this Court subsequently granted.  ECF 19, 20.

On November 20, 2015, Petitioner filed in the Contra Costa County Superior Court a petition for writ of habeas corpus raising two new claims.  Ex. 11 to Answer.  On January 20, 2016, the state superior court denied both claims on the merits and one claim as procedurally barred. Ex. 12 to Answer.  On March 15, 2016, Petitioner re-submitted his new claims to the California Court of Appeal in a petition for writ of habeas corpus.  Ex. 13 to Answer.  The Court of Appeal summarily denied the petition on March 30, 2016.  Ex. 15 to Answer.  On April 8, 2016, Petitioner re-submitted his new claims to the California Supreme Court in a petition for review.  Ex. 16 to Answer.  The California Supreme Court summarily denied review on June 15, 2016.  Ex. 17 to Answer.

On July 15, 2016, Petitioner filed his amended federal petition for writ of habeas corpus in this Court.  ECF 21.

## II.  SUMMARY OF EVIDENCE

In its written opinion, the California Court of Appeal fairly and accurately summarized the factual background of Petitioner's case at trial as follows:

---

[1] The state appellate court found that the sentencing enhancement for intentionally discharging a fire arm was not applicable to the offense of shooting at an occupied vehicle and struck the enhancement.

Three young men—defendant, Alberto Alejandre, and Martin Cerda, Jr.—were jointly charged in the drive-by shooting of 20-year-old Francisco Perez. Defendant and Alejandre were also charged with a second drive-by shooting. Cerda was tried separately from the others. In two separate trials each man claimed the others shot Perez, but all three were convicted and have appealed separately. The following statement of facts is based upon the evidence presented at the joint trial of defendant and Alejandre.

### The August 3, 2009 freeway shooting

Defendant and his friends went out drinking late on the night of August 2, 2009, to celebrate Alejandre's 24th birthday and their party extended into the early morning hours of the next day. The group consisted of defendant, Alejandre, Cerda (Alejandre's cousin), and Claude Richards. According to the police, defendant, Alejandre and Cerda are Sureño street gang members.

Around 1:00 a.m. on August 3, the group headed home with Richards driving defendant's white van. They crossed the Carquinez Bridge and were driving on Interstate 80 when someone in the group opened the van's sliding side door and fired gun shots at another vehicle. A police officer who viewed a surveillance video of the van and its occupants recorded at the Carquinez Bridge toll plaza testified that Nguyen matched the victim's physical description of the shooter. At trial, defendant admitted the group's involvement in the shooting but claimed that Cerda was the shooter.

### Surveillance of Alejandre's vehicle used in the shooting

The police used the Carquinez Bridge surveillance video to obtain the license plate number of the van used in the shooting. Motor vehicle records showed the registered owner sold the van to Alejandre. The police went to Alejandre's house on the afternoon of August 3, 2009, the day of the freeway shooting, and saw the van parked nearby. Later that day, the police placed a global positioning system (GPS) electronic tracking device on the van.

The GPS device permitted the police to monitor the movement, location, and speed of the van from a laptop computer. The device alerted the police when it detected motion and police officers then responded to the scene and followed the van, sometimes keeping the van under direct visual observation but often monitoring the van's movement at a distance with the GPS device. At trial, the police explained that covert surveillance of the van was necessary to preserve evidence of the freeway shooting until they could obtain a search warrant for Alejandre's vehicle and home.

The GPS device was placed on the van late on August 3, 2009, and no motion was detected until around 11:00 p.m. on August 4, about 24 hours later. The police followed the movements of the van throughout the night of August 4 and into the early morning hours of August 5 as the van traveled to multiple locations around the East Bay. The police were never close enough to identify the van occupants or observe their activity, but during the course of tracking the van the police discovered a parked vehicle with its tires and rims removed. At trial, defendant admitted that he, Alejandre, and Cerda spent the night driving in the van, stealing wheel rims from cars along the way.

The van returned to Alejandre's San Pablo home around 5:00 a.m. on August 5. At 6:30 a.m., the van left the house and the police followed the van with the aid of the GPS device. At 6:55 a.m., a police officer saw a van occupant repeatedly open and close the vehicle's sliding side door; the officer thought the van occupant was practicing for another shooting. The van then drove down a small street and the surveillance officer did not follow directly behind for fear of being observed by the van occupants. The officer used the GPS device to monitor the van's location over the next few minutes. The device showed that the van

slowly drove back and forth through the neighborhood of 23rd and Maricopa Streets in San Pablo, making two U-turns and stopping at that intersection at 7:06 a.m.

### The August 5, 2009 shooting

Francisco Perez lived on Maricopa Street. Perez was a former Sureño gang member. Years earlier, in 2003, Perez was with Martin Cerda's older brother, Victor, when Victor shot and killed a rival Norteño gang member. Perez testified against Victor, and Victor was convicted of murder and sentenced to prison.

In 2009, Perez lived with his grandmother and worked as a roofer, leaving for work around 7:00 a.m. On the morning of August 5, Perez left his home for work and a fusillade of gunfire erupted. Perez's grandmother saw a man in a white van shooting at her grandson. A bullet grazed Perez's head and another bullet pierced his liver, heart, and left lung. Perez collapsed on the street and died at his grandmother's feet.

The police arrived at the scene and found 19 shell casings from two different firearms. The recovered shell casings were nine-millimeter and .40 caliber. The police also obtained a surveillance videotape from a nearby store that shows a white van driving back and forth on Maricopa Street in the minutes before the shooting. The videotape shows Perez initially walking toward the store then running from the van as it drove slowly towards him with its side door open.

Cell phone records revealed several calls from defendant's and Alejandre's phones to a known Sureño gang member minutes after the shooting. Defendants' calls were transmitted by cell phone towers along the route traveled by defendant's white van. The police arrested defendant, Alejandre, and Cerda. A search of Alejandre's house found the two handguns used in the Perez shooting; one of those guns had been used in the earlier freeway shooting.

Defendant and Alejandre were tried together.[2] At trial, defendant admitted that he, Alejandre and Cerda were at the Perez shooting. Defendant denied planning the shooting. Defendant said Alejandre was driving the van, looking for more tire rims to steal, when Cerda saw the man who "snitched" on Cerda's brother and directed Alejandre to make a U-turn. Defendant said Alejandre and Cerda spoke together in Spanish and Alejandre made several turns to bring the van back to Perez. Cerda dropped to his knees, opened the van's sliding door, pulled a gun from under his jacket, and fired multiple rounds at Perez. Defendant said he could not see if Alejandre was also shooting at Perez but, when confronted with the fact that two guns were used in the shooting, defendant said the second shooter had to be Alejandre.

### Gang evidence

Sergeant Jeff Palmieri of the San Pablo Police Department testified as a gang expert. He testified to the rivalry between Sureño and Norteño street gangs and described their history, criminal activities, and symbols. Palmieri testified that gangs rely on violence and fear to maintain territory and retain control over its members. He said a gang member who talks to the police puts his life in danger and is labeled a "snitch." The sergeant said a Sureño gang member who snitches on another gang member will be "put in check" by the gang with "a good beat down" or "worse." On cross-examination, Palmieri conceded that the specific instances of Sureño retaliation against cooperating witnesses that he knew about were drawn from police reports and other documents compiled by the prosecutor, not prior personal experience. In closing, the sergeant opined that Perez's killing was done to benefit the gang: "what more of a powerful statement could a gang make . . . than everybody in the area knows that this individual was involved [as] a witness in a crime and now . . . he's dead in the street."

---

[2] Cerda made a pretrial admission that implicated defendant and Alejandre and was thus tried separately. The three men have separately appealed.

4

Ct. App. Decision 2-6 (citations omitted).

### III.   LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Williams*, 529 U.S. at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or

incorrectly." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions. *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v. Richter*, 562 U.S. 86, 96–101 (2011); *Felkner v. Jackson*, 562 U.S. 594 (2011) (per curiam). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'" *Id.* at 598 (citation omitted). With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

## IV. DISCUSSION

Petitioner asserts that: (1) his sixth and fourteenth amendment rights to confrontation and due process were violated based on trial court's admission of hearsay statements from a Carquinez bridge toll taker, and based on ineffective assistance of his counsel for failure to object to such evidence; (2) the prosecutor's prejudicial misconduct during closing argument suggesting that Petitioner traveled to Sacramento to purchase firearms violated his sixth and fourteenth amendment rights, and alternatively that his trial counsel was ineffective for failure to object to this argument; (3) the cumulative prejudicial effect of the hearsay and prosecutor's improper argument violated his fourteenth amendment rights; (4) the prosecution's expert testimony that the shooting was committed for the benefit of a gang without adequate foundation violated his fourteenth amendment right to due process; (5) the lack of oral verdict on Count V, § 186.22(a) (street terrorism), violated his rights to a jury trial under the sixth amendment and his due process rights under the fourteenth amendment; (6) the admission of Petitioner's un-Mirandized statement that he was a Sureño gang member in response to custodial booking questions violated his fifth and fourteen amendment rights against self-incrimination; (7) the first degree murder conviction based on the natural and probable consequences theory of aiding and abetting violated his

fourteenth amendment due process rights. *See generally* Pet.

As noted, the California Supreme Court summarily denied Petitioner's petitions for review. Exs. 10 and 16 to Answer. The California Court of Appeal also summarily denied Petitioner's claims (6) and (7) listed above, based on two 2015 decisions of the California Supreme Court. Ex. 15 to Answer. In its 2013 opinion on direct review, the California Court of Appeal addressed all other claims raised by Petitioner, and thus was the highest court to have reviewed claims (1) through (5) in a reasoned decision. As to Petitioner's claims (6) and (7), the January 20, 2016, decision of the Contra Costa County Superior Court was the highest court to have reviewed these two claims in a reasoned decision. Ex. 12 to Answer. Accordingly, it is the Court of Appeal's 2013 decision, as well as the state Superior Court's 2016 decision, that this Court reviews herein for the respective claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005).

### A. Trial Court's Admission of Hearsay Statements from a Carquinez Bridge Toll Taker

Petitioner argues that his constitutional rights were violated at trial because the jury was told—through the testimony of CHP Officer Benny Rodriguez—that toll collector Hung Nguyen could not identify anyone in Alejandre's van as it passed through the Carquinez Bridge toll plaza on August 3, 2009. Pet. m2-3; 10 RT 1676. Petitioner contends that the statements of the toll taker constituted testimonial hearsay and were admitted in violation of *Crawford v. Washington*, 541 U.S. 36 (2004). Pet. m3. Petitioner acknowledges that his trial attorney did not object to Rodriguez's testimony about the toll taker's statements, so Petitioner alternatively argues that his trial attorney provided ineffective assistance of counsel by failing to preserve the claim of evidentiary error for postconviction review. *Id.* at m7-8.

On appeal, the state appellate court rejected Petitioner's claim that the admission of the hearsay testimony violated his rights:

> Defendant contends that the police statement of a witness who did not testify at trial was wrongly admitted in violation of defendant's right to confront witnesses against him. *Crawford v. Washington*, 541 U.S. 36, 59 (2004). The claim fails because defendant's trial counsel introduced part of the witness statement, which permitted the prosecution to introduce other parts to provide a clear record of the witness's remarks. Evid. Code § 356.

7

The witness statement concerned the August 3, 2009 freeway shooting. The victim testified that the occupant of a van fired shots at her vehicle shortly after the vehicles passed through the Carquinez Bridge toll plaza. A surveillance videotape of the bridge shows the victim's car and Alejandre's van stopping at the toll plaza at the same time, in different lanes. At the toll plaza, defendant opened the van's rear sliding door and gestured in the victim's direction.

A police officer testified that he interviewed the toll takers during his investigation but did not relate the contents of his interviews on direct examination. On cross-examination, defendant's counsel asked the officer to relate portions of one of the toll taker's police statement. Over the prosecutor's hearsay objection, the court admitted the toll taker's statement that there were "occupants" in the van, which established that defendant was not the lone occupant. The defense also established that the toll taker, who was manning the lane traveled by the victim's car, was Asian and had the same name as defendant, Hung Nguyen. Defendant later testified that he opened the van door at the toll plaza to gesture to the toll taker who was his cousin, not to gesture to the victim. Defendant claimed he did not notice the victim until later, when Richards raced up to her car and Cerda opened the sliding door and fired shots. On redirect examination of the investigating police officer, the prosecutor addressed defendant's claimed familiarity with the toll taker, which had been alluded to in the opening statement, by eliciting the toll taker's statement that he could not identify any of the van occupants.

On appeal, defendant claims the prosecutor improperly introduced testimonial statements of the toll taker without an opportunity for cross-examination. *Crawford*, 541 U.S. at 59. The claim fails because the prosecutor was entitled to introduce evidence that completed a statement previously introduced by defendant. Evid. Code § 356.

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const., 6th Amend. Under the confrontation clause, testimonial statements of witnesses absent from trial are generally inadmissible unless the declarant is unavailable to testify at trial and the defendant had a prior opportunity for cross-examination. *Crawford*, 541 U.S. at 59. The confrontation clause, however, does not preclude the prosecution from introducing evidence that completes a statement previously introduced by the defendant. Evid. Code § 356; *People v. Vines*, 51 Cal.4th 830, 862-863 (2011).

Evidence Code § 356 provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party, . . . and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

" 'The purpose of [Evidence Code § 356] is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.' " *Vines*, 51 Ca1.4th at 861. The rule survives *Crawford*. " '[A] party who elects to introduce a part of a conversation is precluded from objecting on confrontation clause grounds to introduction by the opposing party of other parts of the conversation which are necessary to make the entirety of the conversation understood.' " *Vines*, 51 Cal. 4th at 862.

"Application of Evidence Code § 356 hinges on the requirement that the

two portions of a statement be 'on the same subject.'" *Vines*, 51 Cal. 4th at 861. Defendant contends the statute is inapplicable because the portion of the toll taker's statement introduced by the prosecutor constituted a different subject from the one introduced by the defense. We disagree.

In eliciting the hearsay statement of the toll taker, the defense sought to establish that defendant was one among several occupants of the van and innocently opened the van's sliding door to say hello to the toll taker, not to gesture to the victim who was shot at from that door moments later. In bringing out the toll taker's name and ethnicity, he sought to provide confirmation of defendant's testimony that the toll taker was his cousin. The prosecutor was properly permitted to expand the officer's recitation of what the toll taker had said to include his denial of familiarity with the van occupants. While the defense emphasized that the toll taker said he observed multiple occupants, the further statement that he did not recognize any of the occupants was not an unrelated subject. "'In applying Evidence Code §356 the courts do not draw narrow lines around the exact subject of inquiry.'" *Vines*, 51 Cal. 4th at 861. The portions of the statement introduced by both the defense and prosecution related to the toll taker's observations at the bridge toll plaza. The introduction of one portion without the other would have left a misleading impression.

Ct. App. Decision 6-8 (citation altered).

The state appellate court's decision was not contrary to and did not involve an unreasonable application of clearly established federal law. Petitioner fails to identify any clearly established federal law to which the state appellate court decision is contrary or that it allegedly unreasonably applied. Although Petitioner relies on *Davis v. Washington*, 547 U.S. 813, 840 (2006) and *Crawford v. Washington*, 541 U.S. 36, 54 (2004), those cases do not present a situation like the one in this case, where Petitioner's trial counsel first elicited the hearsay testimony from Officer Rodriguez that the toll taker saw other people in the van and that Petitioner was not alone and the prosecutor augmented the record with additional statements by the nontestifying witness.

The Sixth Amendment to the federal Constitution gives a criminal defendant the right to confront and cross-examine adverse witnesses. In *Crawford*, the U.S. Supreme Court created a general rule that the prosecution may not rely on "testimonial" out-of-court statements unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination. 541 U.S. at 59. The Supreme Court further stated that "the Confrontation Clause . . . applies to 'witnesses' against the accused—in other words, those who 'bear testimony.'" *Id.* at 51. However, the Supreme Court also recognized that exceptions on equitable grounds, such as the rule of forfeiture by wrongdoing, could extinguish confrontation claims. *Id.* at 62.

1    After Petitioner's trial counsel offered hearsay testimony from the toll taker that Petitioner

2    was not the only occupant in the van, the subsequent hearsay testimony offered by Officer

3    Rodriguez that the toll taker did not recognize the van occupants was admitted based on California

4    Evidence Code § 356.  That California Evidence Code § 356 and its application in Petitioner's

5    trial did not violate clearly established federal law was made clear by the state appellate court

6    decision: (1) Petitioner had been the initial proponent of some of the hearsay statements of the toll

7    taker from Officer Rodriguez; and (2) Petitioner's trial attorney did not (and could not) object to

8    the prosecutor's later use of additional hearsay testimony in rebuttal.  As seen above, the state

9    appellate court first discussed the Sixth Amendment's confrontation clause and *Crawford*'s

10   holdings, then observed that the confrontation clause "does not preclude the prosecution from

11   introducing evidence that completes a statement previously introduced by the defendant."  Ct.

12   App. Decision 7 (citing Cal. Evid. Code § 356 & *People v. Vines*, 51 Cal. 4th 830, 862-863

13   (2011)).  The state appellate court then followed *People v. Vines*, a California Supreme Court

14   precedent, which found that the Sixth Amendment to the United States Constitution does not

15   preclude the application of the hearsay exception embodied in Evidence Code § 356.  51 Cal. 4th

16   at 862 (noting that "[i]n interpreting the requirements of the confrontation clause, the United

17   States Supreme Court in *Crawford* recognized the continuing validity of exceptions, like the rule

18   of forfeiture by wrongdoing, that derive from equitable considerations rather than an improper

19   judicial determination of reliability").

20   Applying Evidence Code § 356, the state appellate court found that Petitioner's initial

21   introduction of some of hearsay statements from Officer Rodriguez allowed the prosecutor to

22   complete that evidence with a few more of those statements.  Petitioner cites no decision of the

23   United States Supreme Court or Ninth Circuit holding that such an application of a traditional

24   evidentiary rule like Evidence Code § 356 violates the confrontation clause or any other

25   constitutional provision.

26   Petitioner further argues that the portion of the hearsay statement introduced by the

27   prosecutor constituted a "different subject" than that introduced by the defense so Evidence Code

28   § 356 should not apply.  However, as the state appellate court reasonably determined, the

10

statements fell within the same subject matter. Petitioner's trial counsel elicited the hearsay

testimony to establish that Petitioner was one among several occupants of the van and to provide

confirmation of Petitioner's testimony that he innocently opened the van's sliding door to say

hello to the toll taker who was allegedly his cousin, not to gesture to the victim who was shot at

from that door moments later. Given such testimony on cross-examination, the prosecutor was

properly permitted to expand the officer's recitation of what the toll taker had said to include his

denial of familiarity with the van occupants. The portions of the statement introduced by both the

defense and prosecution related to the toll taker's observations of the van at the bridge toll plaza.

This determination by the state appellate court is thus not based on an unreasonable determination

of the law or facts. *See also Vines*, 51 Cal. 4th at 861 ("In applying Evidence Code section 356

the courts do not draw narrow lines around the exact subject of inquiry").

     Alternatively, Petitioner argues that his trial counsel was ineffective for failing to object to

the hearsay testimony elicited by the prosecution. The state appellate court also rejected this

argument:

> Defendant argues, as an alternative claim, that trial counsel rendered
> ineffective assistance of counsel in allowing the prosecution to introduce portions
> of the toll taker's police statement, particularly the portion denying familiarity
> with the van occupants, because that information undermined defendant's
> explanation for opening the van's door and weakened his credibility overall. To
> establish a claim for ineffective assistance of counsel, defendant must establish
> that his attorney's performance fell below an objective standard of reasonableness
> and that the result of the proceedings likely would have been more favorable
> absent the deficiency. *Strickland v. Washington*, 466 U.S. 668 (1984). Defendant
> has done neither.
>
> Trial counsel appears to have made a tactical decision to introduce
> portions of the toll taker's statement with a full understanding that other portions
> could be admitted. A knowing decision is suggested by the fact that he introduced
> the subject over the prosecutor's hearsay objection and never joined in co-
> counsel's objection to the prosecutor's counter evidence. The decision was not
> unreasonable. Counsel may well have thought it helpful to establish that
> defendant was not alone in the van and, thus, not the only possible shooter, and
> had an innocent reason for opening the van door. Some explanation was needed
> because a videotape clearly showed defendant opening the van door at the toll
> plaza and looking toward the victim's traffic lane. On the evidence presented, we
> cannot say that defense counsel was incompetent in introducing the toll taker's
> testimony.
>
> As the Supreme Court has explained, "Judicial scrutiny of counsel's
> performance must be highly deferential. It is all too tempting for a defendant to

11

second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689. Defendant has failed to overcome that presumption.

Even if defense counsel was incompetent in introducing the challenged evidence, the error was not prejudicial. There is direct evidence of defendant's guilt that overshadows the slight injury to defendant's credibility occasioned by the toll taker's statement undermining defendant's claim of kinship. A videotape shows defendant at the toll plaza looking in the victim's direction moments before the shooting. Defendant admitted being the man depicted in the videotape. The victim could not identify defendant in a photo line-up but did testify that the man she saw at the toll plaza was the same man who shot at her. The nine-millimeter handgun used in the freeway shooting was used in another shooting days later. Defendant admitted being at both shootings. A search of defendant's car found a magazine clip and a box of ammunition for a nine-millimeter handgun. Defendant's cell phone contains a photo taken one day before the freeway shooting that shows a handgun sitting on the floor of his car and defendant admitted frequent visits to the shooting range despite being a convicted felon forbidden to possess firearms. Given the state of the evidence, there is no reasonable likelihood that the jury would have returned a verdict more favorable to defendant had the toll taker's statement been excluded.

Ct. App. Decision 8-10.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but also effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). In order to prevail on a claim of ineffective assistance of counsel, Petitioner must prove two elements. First, he must establish that counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as the result of the alleged

12

deficiencies. *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3 (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was deficient after determining that petitioner could not establish prejudice).

The *Strickland* framework for analyzing ineffective assistance of counsel claims is considered to be "clearly established Federal law, as determined by the Supreme Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis. *See Cullen v. Pinholster*, 563 U.S. 170, 188–89 (2011). A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See id.* at 201-02. The general rule of *Strickland*, *i.e.*, to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

The state appellate court's decision rejecting this claim of ineffective assistance of counsel was not contrary to and did not involve an unreasonable application of clearly established federal law. Nor was it an unreasonable determination of the facts in the record before the state court. As the state appellate court noted, when the defense counsel introduced toll taker's hearsay statements on his cross-examination of Officer Rodriguez, it was likely with a full understanding that other portions of the hearsay statements would be presented to the jury through Rodriguez. This is because Petitioner's counsel sought evidence that there were other occupants in the van over the prosecutor's hearsay objection and never joined in co-counsel's objection to the later-admitted hearsay statements. It is a "reasonable argument" that counsel thought it important to corroborate that Petitioner was not alone in the van and, thus, not the only possible shooter, and had an innocent reason for opening the van door, regardless of whether the toll taker recognized the van occupants. *See Harrington*, 131 S. Ct. at 788.

The state appellate court's prejudice analysis also sufficiently showed that the failure to

object to the hearsay statement introduced by the prosecution resulted in no prejudice. Assuming that the toll taker's subsequent hearsay statement was excluded, the state appellate court correctly concluded that there was direct evidence of defendant's guilt that overshadowed the slight injury to Petitioner's credibility occasioned by the toll taker's statement undermining Petitioner's claim of kinship. Such evidence included: Petitioner's admission that he was the man depicted in the toll plaza videotape moments before the shooting; the freeway shooting victim's testimony that the man she saw at the toll plaza was the same man who shot at her; the handgun used in the freeway shooting was used in another shooting days later; Petitioner's admission that he was present at both shootings; a magazine clip and a box of ammunition for the same type of handgun in Petitioner's car; a photo in Petitioner's cell phone taken one day before the freeway shooting that shows a handgun sitting on the floor of Petitioner's car; and Petitioner's admission that he frequently visited a shooting range despite being a convicted felon forbidden to possess firearms. Ct. App. Decision 9-10. Petitioner also initially lied to the police shortly after his arrest, denying awareness of the freeway shooting and the shooting of Perez, undermining his credibility. Given this and other evidence, as well as his close association with Cerda and Alejandre, Petitioner's trial testimony that his co-defendant had shot at a car on the Carquinez Bridge and at Perez without Petitioner's assistance would not be credible to a jury. Thus, it cannot be said that but for counsel's failure to object to the singular hearsay comment by the toll taker—that he could not identify any occupants of the van at the toll plaza on August 3, 2009—"the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

**B.     Prosecutor's Argument Suggesting that Petitioner had Traveled to the Sacramento Area to Buy Firearms**

Petitioner contends that the prosecutor committed misconduct by improperly suggesting to the jury that Petitioner had traveled to the Sacramento area to buy firearms a few days before the killing of Perez. Pet. m12. Petitioner acknowledges that the defense attorney did not object to the prosecutor's comments at trial, so he alternatively asserts ineffective assistance of counsel claims. *Id.* at m15. On appeal, the state appellate court rejected Petitioner's claim that the prosecutor committed misconduct:

Defendant contends the prosecutor committed misconduct during closing argument by arguing facts not in evidence. "We review claims of prosecutorial misconduct pursuant to a settled standard. 'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"' In addition, '"a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety."' Objection may be excused if it would have been futile or an admonition would not have cured the harm." *People v. Dykes*, 46 Cal. 4th 731, 760 (2009).

Defendant did not object to the prosecutor's closing argument and thus forfeited his argument of prosecutorial misconduct. However, he also claims trial counsel rendered ineffective assistance of counsel in failing to object and thus we must consider whether the prosecutor's comments were objectionable.

We conclude that the prosecutor's comments constituted a permissible attack upon defendant's credibility. The prosecutor discussed evidence that defendant lied during his police interview and trial testimony and used that evidence to discredit defendant's claim that he did not knowingly participate in the shootings. The prosecutor asked the jurors to "[t]hink to yourself for a minute why do people lie? They lie to cover up something bad that they've done. They lie when they think they're wrong. This is why his lies are evidence of his guilt. Mr. Nguyen's lies . . . prove his guilt."

In listing defendant's lies, the prosecutor referred to defendant's testimony on cross-examination denying traveling to Sacramento with Cerda on August 1, 2009, days before the first shooting. The prosecutor pressed defendant to admit his travels and defendant refused, insisting that he (and his cell phone) were in Oakland. The prosecutor suggested that defendant was hiding something and asked defendant if "something bad happened" in Sacramento he did not want to disclose. The prosecutor asked defendant, "Is that where you got the gun?" Defendant said no. Defendant's testimony insisting that he was in Oakland on the day in question was refuted by cell phone records showing his presence in Sacramento.

In a portion of the closing argument challenged on appeal, the prosecutor asked rhetorically: "Why lie about August 1st, 2009? Well, I don't know what it is that happened in Sacramento on August 1st, 2009. Maybe it's when they went and got the guns. Maybe that's a part of it. Why does he need to put the distance between himself and Mr. Cerda? . . . Well, maybe it's when they got the guns. I don't know. Maybe something else bad happened up there. I don't know why he lied so blatantly about August 1st of 2009. But he lied because he was covering something up. I don't know what that was. And I don't think we'll ever know for sure."

The prosecutor returned to the topic on rebuttal. The prosecutor told the jurors: "the only way [defendant is] not guilty of these crimes is to believe all the fabrications" but "how can you possibly believe everything Mr. Nguyen says when he sat up there on the stand and lied to your faces about being in Reno or Sacramento on August 1st? How can you believe him? [¶] And it was posed by Mr. Alejandre's attorney [that] they could have been in Reno for anything, birthday, who cares. Okay. Then why lie? Why lie? Why not say, yeah, we went up there to party for Mr. Alejandre's birthday? That's not a crime. [¶] If there's an innocent explanation behind it, why lie? Which is something you apply to all of Mr. Nguyen's testimony: Why lie to the cops? Why sit up here and lie? Why do you lie? Because you've done something wrong and you know it. That's why you lie."

Defendant argues that the prosecutor wrongly implied that defendant went to Sacramento to obtain guns when defendant's purpose in going to Sacramento was never proven. It is true that the prosecutor mentions, as a possibility, that defendant obtained guns in Sacramento but the thrust of the prosecutor's argument was that defendant lied in denying the trip and, thus, his testimony as a whole should be distrusted. Contrary to defendant's claim on appeal, the prosecutor did not offer his own "unsworn testimony" that defendant went to Sacramento to obtain guns. The prosecutor said, "I don't know what it is that happened in Sacramento on August 1st, 2009. Maybe it's when they went and got the guns . . . . I don't know. Maybe something else bad happened up there . . . . But he lied because he was covering something up. I don't know what that was. And I don't think we'll ever know for sure." The prosecutor's point was that defendant lied and that his lies show a consciousness of guilt: "Why do you lie? Because you've done something wrong and you know it. That's why you lie."

When read in context, the prosecutor was making the permissible argument that defendant was not credible. "The prosecution is given wide latitude during closing argument to vigorously argue its case and to comment fairly on the evidence, including by drawing reasonable inferences from it." *People v. Lee*, 51 Cal. 4th 620, 647 (2011). It is well-established that a " 'prosecutor is permitted to urge; in colorful terms, that defense witnesses are not entitled to credence . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated.' " *People v. Boyette*, 29 Cal. 4th 381, 433 (2002). The prosecutor's remarks were proper and defense counsel was not remiss in choosing not to object.

Ct. App. Decision 10-12 (citation altered).

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). Habeas corpus relief is warranted only if the prosecutor's comments in closing argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citation omitted). "Prosecutors must have reasonable latitude to fashion closing argument, and thus can argue reasonable inferences based on

the evidence." *United States v. Necoechea*, 986 F.3d 1273, 1276 (9th Cir. 1993); *see also*
*Menendez v. Terhune*, 422 F.3d 1012, 1037 (9th Cir. 2005).

As a preliminary matter, the state appellate court expressly found that Petitioner's claims
of error had been forfeited because his trial counsel had not objected to any of the prosecutor's
questions or closing-argument statements at issue here. Ct. App. Decision 10. Under California
law, a defendant may not assert a posttrial claim of prosecutorial misconduct unless there was a
timely objection and request for an admonition at trial. *People v. Earp*, 20 Cal. 4th 829, 877
(1999). Given that Petitioner failed to observe California's "contemporaneous objection" rules, he
may not challenge the constitutionality of the conviction in federal court. *See Paulino v. Castro*,
371 F.3d 1083, 1093 (9th Cir. 2004); *Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir. 1981). Thus,
petitioner's claim of misconduct is procedurally barred on federal habeas corpus review.

Even if this Court were to entertain the merits of this claim, the state appellate court's
rejection of Petitioner's claim was not contrary to or an objectively unreasonable application of
clearly established federal law, or an unreasonable determination of the facts. As set forth in the
state appellate court's decision, the prosecutor's closing-argument comments did not imply that he
had personal information about the reason for Petitioner's trip to the Sacramento area. 21 RT
3809; Pet. m13. In fact, the prosecutor repeatedly told the jurors that he did not know why
Petitioner had gone to that area. 21 RT 3809. Although Petitioner testified that he was not in the
Sacramento area, Ct. App. Decision 11, 18 RT 3369-3370, cell phone evidence proved to the
contrary. 20 20 RT 3634-3635, 3639, 3649; 18 RT 3368-3369; 19 RT 3459; Answer 34. As such,
the prosecutor had a reasonable basis to argue that Petitioner must have lied when he denied
having made such a trip. Petitioner argues that the thrust of the prosecutor's argument was to
speculatively claim that Petitioner traveled to Roseville to purchase firearms and not to solely
attack his credibility. Traverse 3. However, in reviewing the transcript of the closing argument,
the prosecutor's argument focused on Petitioner's credibility and not on the assertion that he
traveled to Roseville to purchase firearms as a fact. As such, the state appellate court's conclusion
that the prosecutor was attacking Petitioner's credibility was not an unreasonable determination of
the facts. Accordingly, as noted by the state appellate court, a prosecutor "is permitted to urge, in

colorful terms, that defense witnesses are not entitled to credence . . . [and] to argue on the basis of inference from the evidence that a defense is fabricated." Ct. App. Decision 12; *see also United States v. Alcantara-Castillo*, 788 F.3d 1186, 1194 (9th Cir. 2015) (not plainly improper when prosecutor said that "one of these two witnesses [a government agent and the criminal defendant] is not telling the truth" because "it was reasonable to infer from the evidence that either witness was lying"); *United States v. Moreland*, 622 F.3d 1147, 1161 (9th Cir. 2010) ("it is 'neither unusual nor improper for a prosecutor to voice doubt about the veracity of a defendant who has taken the stand'") (citation omitted).

Given that the prosecutor did not commit misconduct, the defense trial counsel's failure to object did not reflect incompetence. Accordingly, trial counsel's failure to object to the prosecutor's argument at issue here was not ineffective. Further, based on the weight of the evidence in support of the verdict discussed above, there can be no prejudice, either. *See Strickland*, 466 U.S. at 694 (noting that a petitioner must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

### C. Cumulative Effect of the Errors Alleged in Claims 1 and 2 Above.

Petitioner contends that his convictions must be reversed because of the cumulative impact of the errors alleged in Claims 1 and 2, discussed above. However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *See Hayes v. Ayers*, 632 F.3d 500, 524 (9th Cir. 2011). Similarly, there can be no cumulative error when there has not been more than one error. *United States v. Solorio*, 669 F.3d 943, 956 (9th Cir. 2012). Because neither of Petitioner's individual arguments has merit, there was no cumulative error or prejudice.

### D. Trial Court's Admission of Expert Testimony of Sergeant Palmieri

Petitioner argues that the trial court violated due process in allowing the prosecution gang expert, Sergeant Palmieri, to opine on the defendants' reason for killing Perez. Pet. m17-18. Petitioner claims that Sergeant Palmieri's knowledge about the Sureño gang's five prior assaults on informants was all derived from information which the prosecutor provided to him in

preparation for trial. *Id.* at m19; 16 RT 2839-2841. Based on Sergeant Palmieri's alleged lack of

personal knowledge other than the information provided to him by the prosecutor, Petitioner

objects to Sergeant Palmieri as an unqualified expert for testifying that Perez's killing was for the

benefit of a street gang. *Id.* at m19-20; 16 RT 2830-2836, 2847.

On appeal, the state appellate court rejected this claim as follows:

As noted above, Sergeant Jeff Palmieri of the San Pablo Police Department testified as a gang expert. He testified that gangs rely on violence and fear to maintain territory and to retain control over its members, and will retaliate against those who cooperate with the police. Palmieri opined that the killing of Perez, who had testified against Sureño gang member Victor Cerda, was done to benefit the gang. Defendant contends there was insufficient foundation for Palmieri's opinion because it was based on evidence of gang retaliation contained in police reports and transcripts of testimony selected and provided to the officer by the prosecutor and not on the officer's personal knowledge of gang assaults or information he personally collected. Defendant contends that admission of the officer's opinion of a gang-related motive was prejudicial because the other alleged participants in the shooting had a family relationship with Victor Cerda, suggesting a possible personal motive.

The foundation for the officer's opinion was properly established in a pretrial hearing. Evid. Code § 402. At that hearing, Sergeant Palmieri testified that Sureño and other street gangs have a practice of inflicting injury or death upon those who provide information to law enforcement agencies. The Sureño retaliate against "snitches" to "keep the gang strong and send a message that snitching or telling on the gang will not be tolerated." The officer said the Sureño believe that "if the gang did not punish those individuals who were involved in giving up information, the gang would become weak and soon would not be able to operate." Palmieri acknowledged that he had not personally investigated cases where Sureño retaliated against cooperating witnesses but knew of multiple cases of retaliation from documents provided by the prosecution. The officer read and relied upon police reports and excerpts of grand jury transcripts to describe in detail five specific instances in which Sureño attacked, or tried to attack, cooperating witnesses. Defendant objected that there was no proper foundation for Palmieri's opinion because it was based on documents provided by the prosecutor rather than information personally known or independently obtained. The court overruled the objection, stating that it "goes to the weight not the admissibility" of the officer's testimony.

The evidence was properly ruled admissible. An expert witness's testimony need not be based on information which he personally collected. An expert witness may base his opinion on matter "personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates. . . . " Evid. Code § 801(b). Sergeant Palmieri reasonably relied on police reports and grand jury transcripts provided to him by the prosecutor before the hearing that detailed Sureño gang

United States District Court
Northern District of California

retaliation against cooperating witnesses. The defense reviewed the materials and cross-examined Palmieri at length about the basis for his opinion. No evidence was presented, then or now, that the information was faulty. The foundation for the officer's opinion was properly established.

Ct. App. Decision 13-14.

Based on the record, the state appellate court's denial of this claim was not contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts. First of all, there is not a clearly established federal law enunciated by the Supreme Court that an expert cannot base opinion testimony on material "that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." *See* Cal. Evid. Code § 801(b). Second, assuming that Sergeant Palmieri opined on an ultimate issue in connection with the gang enhancement charges, the United States Supreme Court has left open the question whether the Constitution is violated by the admission of expert testimony concerning an ultimate issue to be resolved by the trier of fact. *See Moses v. Payne*, 555 F.3d 742, 761 (9th Cir. 2009). Thus, while under Ninth Circuit precedent, it is "well established . . . that expert testimony concerning an ultimate issue is not per se improper," *id.* (quotation and citation omitted), for purposes of habeas corpus review it suffices to determine that no Supreme Court case has squarely addressed the issue and, therefore, a state appellate court's decision affirming the admission of such testimony is not contrary to or an unreasonable application of clearly established Supreme Court precedent under 28 U.S.C. § 2254(d)(1). *See id.* at 761-62; *see, e.g.*, *Briceno v. Scriber*, 555 F.3d 1069, 1078 (9th Cir. 2009) (habeas relief not available under § 2254(d) for the claim that expert's opinion testimony as to whether hypothetical robberies would have been gang-related should have been excluded because it pertained to the ultimate issue for the jury); *Brown v. Horell*, 644 F.3d 969, 983 (9th Cir. 2011) (habeas relief not available under § 2254(d) for claim that expert testimony to show improper interrogation methods should have been admitted because Supreme Court has not squarely addressed the issue (citing *Moses*, 555 F.3d at 758-59).

Finally, the alleged failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *See Estelle v. McGuire*, 502 U.S. 62, 67 (1991) (noting that an allegedly erroneous evidentiary ruling based on

1   state law "is no part of a federal court's habeas review of a state conviction"); *Henry v. Kernan*,

2   197 F.3d 1021, 1031 (9th Cir. 1999); *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

3   While adherence to state evidentiary rules suggests that the trial was conducted in a procedurally

4   fair manner, it is certainly possible to have a fair trial even when state standards are violated;

5   conversely, state procedural and evidentiary rules may countenance processes that do not comport

6   with fundamental fairness. *See id.* (citing *Perry v. Rushen*, 713 F.2d 1447, 1453 (9th Cir. 1983),

7   cert. denied, 469 U.S. 838 (1984)). The due process inquiry in federal habeas review is whether

8   the admission of evidence was arbitrary or so prejudicial that it rendered the trial fundamentally

9   unfair. *Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984,

10  990 (9th Cir. 1986); *Montana v. Egelhoff*, 518 U.S. 37, 47 (1996) (a due process violation results

11  only if an evidentiary ruling "offends some principle of justice so rooted in the traditions and

12  conscience of our people as to be ranked as fundamental"). But note that only if there are no

13  permissible inferences that the jury may draw from the evidence can its admission violate due

14  process. *See Jammal*, 926 F.2d at 920.

15       As reasonably determined by the state appellate court, the admitted opinion testimony had

16  proper foundation and did not contravene state evidentiary rules or federal due process. Sergeant

17  Jeff Palmieri was the supervisor of the gang unit at the San Pablo Police Department. 16 RT 2860,

18  2881. He became knowledgeable of the Sureño and Norteño gangs in California in his work

19  investigating gang-related cases and talking to witnesses. 16 RT 2881-2883, 2894-99. Although

20  he acknowledged that he was not personally aware of a specific case in which Sureño had actually

21  harmed a cooperating witnesses, 2 RT 324; 16 RT 3004-3012, he also opined that witnesses he

22  interviewed in his gang-related cases were often reluctant to cooperate, or "snitch." 16 RT 2895-

23  99. When counsel for Alejandre questioned Sergeant Palmieri on cross-examination, the sergeant

24  also revealed that his knowledge of the five instances in which Sureño had retaliated against

25  witnesses came from documents provided by the prosecutor. 16 RT 3004-3012.

26       Based on the experience, knowledge, and testimony of Sergeant Palmieri as reflected in the

27  record, it was not unreasonable for the state appellate court to conclude that Sergeant Palmieri's

28  testimony need not solely be based on information which he personally collected and that he could

also rely "on police reports and grand jury transcripts provided to him by the prosecutor" in accordance with California evidentiary rule. Ct. App. Decision 14. As the trial court also noted, whether the material was derived from the Sergeant's personal knowledge prior to receiving the documents from the prosecutor "goes to the weight not the admissibility" of the officer's testimony. *Id.* at 13-14; s*ee People v. Jones*, 54 Cal.4th 1, 59 (2012) ("Once an expert witness establishes knowledge of a subject sufficient to permit his or her opinion to be considered by a jury, the question of the degree of the witness's knowledge goes to the weight of the evidence and not its admissibility"). As such, allowing an expert opinion based on documents provided by the prosecution was not "arbitrary or so prejudicial that it rendered the trial fundamentally unfair." *See Walters*, 45 F.3d at 1357.

Petitioner's citations of *Walters* and *Ege v. Yukins* do not compel a different conclusion. The *Walters* court found that the state court's admission of a petitioner's prior convictions did not violate due process. 45 F.3d at 1357-58. And *Ege v. Yukins* is inapposite to the case here. 485 F.3d 364, 374, 376, 378 (6th Cir. 2007). In *Ege*, the state habeas court had already determined the admission of expert testimony was erroneous because an expert's bite-mark testimony that the dentition would randomly match "by a probability of 3.5 million to one" was wholly without foundation. *Id.* at 374. But the state court found the error to be non-prejudicial. *Id.* The Sixth Circuit disagreed with the state court on the prejudice analysis and determined that such error was prejudicial because "the injurious effect" of the probability testimony was not in any way diffused by the experts put on by the petitioner's counsel. *Id.* at 377. In contrast to *Ege*, there was no error of evidentiary ruling to begin with in Petitioner's case, so the holding in *Ege* on whether the error was prejudicial has limited application. Moreover, Sergeant Palmieri's testimony had foundation and was proper under California evidentiary rules, even if that foundation was derived in part from documents received from the prosecutor. The jury was also entitled to draw the permissible inferences that the charged offenses were committed for the benefit of the gang based on Sergeant Palmieri's testimony. *See Jammal*, 926 F.2d at 920 ("Only if there are no permissible inferences the jury may draw from the evidence can its admission violate due process"). Accordingly, the admitted testimony of Sergeant Palmieri's did not render the trial fundamentally unfair. *See*

### E.    Failure to Provide an Oral Verdict on Count V

Because the clerk did not read aloud the written verdict form for Count 5, street terrorism, in conjunction with the murder of Francisco Perez, Petitioner argues that this lack of an oral verdict constitutes a "structural error" and his conviction on Count 5 should be invalidated.  Pet. m21-22.  The state appellate court determined that this alleged error was forfeited by a failure to object and that the inadvertent omission was harmless:

> Defendant contends that the jury's verdict on count five for street terrorism must be vacated because the written verdict was not read aloud and affirmed by the jurors.  Defendant forfeited this contention by failing to object in the trial court.  Moreover, the inadvertent omission was harmless.
>
> The jury returned 38 pages of written verdict forms addressing 12 counts with multiple findings as to both defendants Nguyen and Alejandre. The jury foreperson verbally affirmed that the jury had reached its verdict and handed the forms to the court bailiff. The forms record a guilty verdict and true finding on all six counts alleged against Nguyen. The court clerk proceeded to read the verdict forms and the jury panel affirmed the verdict "as read."  The clerk failed to read aloud the verdict on count five finding defendant guilty of street terrorism. § 186.22(a).  The clerk skipped from count four to count six. The clerk then individually polled the jurors, asking: "As to defendant Hung Nguyen, count 1 through count 6, and each finding, is this your verdicts as read," and each juror said "yes." The court directed the court clerk to "record the verdicts as read." The minute order lists all verdicts, including the guilty verdict on count five.
>
> Defendant argues that the absence of an oral jury verdict is a structural error mandating reversal.  That argument has been eclipsed by a recent California Supreme Court case issued after defendant's opening brief was filed on appeal. *People v. Anzalone*, 56 Cal. 4th 545 (2013).  In *Anzalone*, the trial court read aloud written jury verdicts finding the defendant guilty on multiple counts but failed to ask the jury foreperson or jurors to affirm the verdicts.  *Id.* at 549-550. Section 1149 provides: "When the jury appear they must be asked by the court, or clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same."  The court held that "a defendant who does not object to the trial court's failure to comply with section 1149 forfeits the argument that the trial court erred."  *Anzalone*, at 551. The court also found that the lack of an oral acknowledgement of the verdict in open court is not a structural defect but a procedural error subject to harmless error review.  *Id.* at 555-560.
>
> Defendant here failed to object to the omission of count five when the verdicts were read and thus forfeited his complaint of noncompliance with Penal Code section 1149.  Even were we to reach the merits, it is clear that the omission was harmless. The jury returned written verdict forms and, when doing so, the jury foreperson affirmed the verdicts.  The court asked "has the jury reached verdicts" and the foreperson said "we have, Your Honor."  The only error

occurred in the failure to read one of the counts and obtain the individual jurors'
affirmation of that count. The jurors were individually polled as to "the verdicts
to count 1 through 6," which suggests juror affirmation of all counts, although the
polling was itself flawed in referring to the "verdicts as read." These slight
procedura1 errors were harmless. The jurors returned written verdicts and
unanimously affirmed their agreement with "the verdicts to count 1 through 6."
The jury was dearly instructed on the requirement of unanimity and the record
fails to show any disagreement among the jurors or indication that the juror's
verdict on count five was anything but unanimous. The error was plainly
harmless.

Ct. App. Decision 14-15 (citation altered).

As a preliminary matter, the state appellate court expressly found that Petitioner's alleged error had been forfeited because his trial counsel did not object to the omission of an oral verdict on Count V. Ct. App. Decision 15. California Penal Code § 1149 provides: "When the jury appear they must be asked by the Court, or Clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same." Under California law, a defendant may not assert a posttrial claim on the supposed noncompliance with § 1149, unless there was a timely objection at trial. *People v. Anzalone*, 56 Cal. 4th 545, 550 (2013). Given that Petitioner did not object, he may not challenge the constitutionality of the conviction in federal court. *See Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004) (finding the issue procedurally barred on habeas review because "defense counsel consented to the trial court's handling of the issue").

Moreover, even if this Court were to reach the merits, as did the state appellate court, the state appellate court decision was not contrary to or an unreasonable application of clearly established federal law, or an unreasonable determination of the facts based on the record before the state court. First, Petitioner has not identified a clearly established federal law as determined by the Supreme Court applicable here. While a trial by jury and an actual jury verdict are rights compelled by the Sixth Amendment, there is no clearly established federal law that an oral verdict must be provided.

Second, Petitioner's assertion that the lack of an oral verdict is a structural error in violation of his Fourteenth Amendment rights is also without merit. Denial of Fourteenth Amendment Due Process Rights in a criminal trial "is the failure to observe that fundamental

fairness essential to the very concept of justice." *Lisenba v. California*, 314 U.S. 219, 236 (1941). "[W]e must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." *Id.* (a coerced confession admitted in evidence is contrary to due process). Unless fundamental fairness is abridged, federal court interference is unwarranted. *Chavez v. Dickson*, 280 F.2d 727, 735 (9th Cir.1960).

Relatedly, structural error is a "defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Accordingly, where a criminal proceeding is undermined by a structural error, the "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence," and the defendant's conviction must be reversed. *Id.* Only in those limited cases where the constitutional deprivation affects "the framework within which the trial proceeds," is the integrity of trial process so compromised that the "criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence." *Id.* These cases are rare and require automatic reversal, *Washington v. Recuenco*, 548 U.S. 212, 218 (2006); *Brecht v. Abrahamson*, 507 U.S. 619, 629-30 (1993), whether on direct or habeas review, *Powell v. Galaza*, 328 F.3d 558, 566 (9th Cir. 2003).

The list of Supreme Court cases in which structural error analysis has been found to apply is short. *Campbell v. Rice*, 408 F.3d 1166, 1172 (9th Cir. 2005). They are: *Sullivan v. Louisiana*, 508 U.S. 275, 281 (1993) (beyond a reasonable doubt standard); *Vasquez v. Hillery*, 474 U.S. 254, 264 (1986) (unlawful exclusion of member of defendant's race from grand jury); *Waller v. Georgia*, 467 U.S. 39, 49-50, 49 n.9 (1984) (right to public trial); *McKaskle v. Wiggins*, 465 U.S. 168, 177-78 n.8 (1984) (violation of right to self-representation at trial); *Gideon v. Wainwright*, 372 U.S. 335, 344-45 (1963) (deprivation of right to counsel); and *Tumey v. Ohio*, 273 U.S. 510, 531-32 (1927) (trial by biased judge). *Campbell*, 408 F.3d at 1172. *See also Herring v. New York*, 422 U.S. 853, 858-59, 863-65 (1975) (total denial of closing argument constituted structural error). In the decade since *Campbell*, the Supreme Court has found structural error in just two other situations. *See Williams v. Pennsylvania*, 136 S. Ct. 1899, 1909 (2016) (interested judge's unconstitutional failure to recuse himself from a multi-member appellate panel was structural

error, even if he did not cast a deciding vote); *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006) (denial of individual's right to counsel of choice is structural error).

Some cases in which the Ninth Circuit has found structural error are: *Cordova v. Baca*, 346 F.3d 924, 930 (9th Cir. 2003) (violation of right to counsel not effectively waived where trial court failed to provide *Faretta* warnings to defendant representing himself); *Powell*, 328 F.3d at 566-67 (holding mandatory presumption in jury instruction which deprives defendant of a verdict decided by a jury violated the Sixth Amendment); *Sheppard v. Rees*, 909 F.2d 1234, 1237-38 (9th Cir. 1989) (denial of right to be informed of nature and cause of criminal accusation).

Based on the above, neither the Supreme Court nor the Ninth Circuit has identified the alleged error underlying Petitioner's claim here to be a structural error. Petitioner similarly fails to demonstrate how the lack of an oral verdict "fatally infected the trial [and] prevent[ed] a fair trial." *Lisenba*, 314 U.S. at 236. The standard instructions given to Petitioner's jury emphasized that the jurors were required to unanimously agree before they could return a verdict of guilty or not guilty on any given count or allegation. 21 RT 3995, 3999. The instructions also stated that the jurors: (1) should not complete a verdict form if they could not unanimously agree on a count, 21 RT 3995-3996; and (2) were required to return separate verdict forms for each count and allegation, 21 RT 3996. On June 7, 2010, the trial court assembled the jurors and asked the foreperson, "[H]as the jury reached verdicts?," to which the foreperson responded, "We have, your Honor." 22 RT 4058. The verdict forms show that the jury convicted Petitioner on all six counts and found true all allegations. 6 CT 1526-1545. The clerk read aloud the verdict but inadvertently skipped reading for Count V. 22 RT 4058-4074; s*ee* 6 CT 1540-1543 (showing that the verdict form for count 4 (6 CT 1540) is immediately followed by the form for count 5 (6 CT 1541) which in turn is followed by the forms for the allegations to count 4 (6 CT 1542-1543)). When the jury was polled, the clerk asked the jurors, "As to Defendant Hung Nguyen, Count 1 through Count 6 and each finding, is this your verdicts [*sic*] as read?" 22 RT 4076. Each juror said, "Yes." 22 RT 4076- 4077. The court instructed the clerk to "record the verdicts as read." 22 RT 4077. The clerk responded, "The verdicts are recorded as read." 22 RT 4077.

Based on the facts in the record as summarized above, the state appellate court reasonably

found that the jury actually reached an unanimous verdict on Count V and that the error of not

orally providing the verdict on Count V was harmless. In reaching that conclusion, the state

appellate court relied on *People v. Anzalone*, in which the California Supreme Court addressed

whether the failure "to ask the jury foreperson or the jurors to affirm their verdict as required by

section 1149" was a structural error. 56 Cal. 4th 545, 550 (2013). The California Supreme Court

concluded that the "failure to follow § 1149's requirement did not deprive defendant of her

constitutional right to a unanimous jury verdict" and that the error "did not render the trial

fundamentally unfair." *Id.* at 560. In accordance with *Anzalone*, the state appellate court then

found Petitioner's claim here to be harmless error. Petitioner argues that his case is

distinguishable from *Anzalone*, because the error alleged here involved a failure to read into the

record each of the jury's findings while *Anzalone* involved failure of the jurors to affirm their

verdict. Pet. m22. This distinction, however, does not make the state appellate court's decision

unreasonable. Similar to *Anzalone*, it is apparent based on the record, and Petitioner does not

dispute, that the jury reached a unanimous verdict on all of Petitioner's convicted counts.

Although the error in *Anzalone* is not exactly identical to that alleged by Petitioner here, both

involved an alleged violation of California Penal Code § 1149, which the California Supreme

Court determined not to be a constitutional violation. Petitioner fails to demonstrate how the

distinctions from *Anzalone* made the state appellate court decision unreasonable or contrary to

clearly established federal law.

**F.    Trial Court's Admission of Petitioner's Un-Mirandized Statement that He was a Sureño in Response to Custodial Booking Questions.**

Petitioner contends his convictions, including his gang crime and gang enhancement, are

tainted because the jury heard evidence that he repeatedly acknowledged, when incarcerated on

earlier arrests, that he was a member of the Sureño gang. Pet. m23-24, 26. Petitioner argues that

his statements were admitted in violation of a recent decision of the California Supreme Court,

*People v. Elizalde*, 61 Cal. 4th 523 (2015). Pet. m23. Petitioner further contends that admission

of his statement was prejudicial. *Id.* at m26.

The state superior court found no prejudicial effect from this alleged error and denied

> The rule in *Elizalde* is that a defendant's right against self incrimination is violated upon admission at trial of a defendant's response(s) to gang-affiliation questions asked during jail booking. While such responses in this case may have been error under *Elizalde*, it is questionable whether that error was prejudicial to petitioner.  Counsel has not provided any record of petitioner's trial.  The claim of error must be reviewed on the basis or the trial record, and that record has not been supplied to the court in this matter.  *See Sherwood v Superior Court*, 24 Cal. 3d 183, 186 (1979) (petitioner must file a record adequate for writ relief).
>
> Even if petitioner had lodged the record of petitioner's trial with the court, it is questionable whether petitioner would be able to claim prejudice. The theory of the whole case was that the shooting of the victim was gang retaliation for the victim's testifying against gang member Victor Cerda.  Thus, whether petitioner was a gang member or a wanna be or a friend of the two other Sureño defendants, as he was at least with co-defendant Sureño Alejandre, the case revolved around the gang issue.  Whether petitioner was a gang member or not does not detract from his presence in the vehicle from which the fatal shots were fired.  Further, the case was tried with petitioner as a principal, which means the People's theory of the case was that petitioner was a shooter.   Being a gang member, or alleged gang member, or not a gang member at all, does not alter the culpability of petitioner as a principal.

Superior Ct. Decision 5, Ex. 12 to Answer, ECF 31-8.

First, the state court's rejection of this claim was not contrary to or an unreasonable application of clearly established federal law.  As acknowledged by Petitioner, there was no clearly established federal law barring the admission of un-Mirandized statements on gang affiliations in response to booking questions.  Pet. m23; Traverse 5-6 (noting that both *Rhode Island v. Innis*, 446 U.S. 291 (1980) and *Pennsylvania v. Muniz*, 496 U.S. 582 (1990) did not require *Miranda* warnings during booking questions and that "United States Supreme Court has not in fact made a ruling identical to *Elizalde*").  Accordingly, habeas relief is not warranted.  *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("But it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts") (italics in original); *Shannon v. Newland*, 410 F.3d 1083, 1089 (9th Cir. 2005) (a decision of the California Supreme Court announced after the petitioner's conviction had become final did not justify federal habeas relief, even though the decision changed state law in a way that would have made it more likely that the petitioner would have been convicted of a lesser offense if the decision had been in effect at the time of the petitioner's trial).

Second, that the California Supreme Court later pronounced that type of statement to be inadmissible in *Elizalde* also does not entitle Petitioner to relief. A federal court can disturb on due process grounds a state court's procedural or evidentiary ruling only if the ruling was arbitrary or so prejudicial that it rendered the trial fundamentally unfair. *See Walters v. Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *see also Penry v. Johnson*, 532 U.S. 782, 795 (2001) (holding that habeas relief is warranted only if the error had a "substantial and injurious effect or influence in determining the jury's verdict") (quoting *Brecht*, 507 U.S. at 638). Petitioner further acknowledges that the alleged constitutional error is subject to harmless error analysis. Pet. m24 (citing *Fulminante*, 499 U.S. at 310).

Here, the state superior court reasonably found based on the record before it that Petitioner did not demonstrate prejudice due to the admission of this statement. Petitioner did not dispute at trial that he was present with Alejandre and Cerda during both shootings, and that Alejandre and Cerda were both Sureños. Accordingly, even if Petitioner's admission to being a Sureño were to be excluded from trial, the exclusion would not negate the evidence that he associated with Sureños and that he was present in the van at the time of the shootings. Superior Ct. Decision 5. In the context of other evidence in support of Petitioner's guilty verdicts discussed above, the admission of Petitioner's gang-affiliation statement cannot be said to have had a "substantial and injurious effect or influence in determining the jury's verdict." *See Brecht*, 507 U.S. at 638.

**G.    Jury Instruction on Natural and Probable Consequences Theory of Aiding and Abetting.**

Petitioner argues that his first degree murder conviction must be reduced to second degree murder because the jury instructions allowed the conviction to be based on the "natural and probable consequences" doctrine, in violation of a recent decision of the California Supreme Court, *People v. Chiu*, 59 Cal. 4th 155 (2015). Pet. m26-27. According to Petitioner, the *Chiu* court held that "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved." Pet. m27 (citing 59 Cal. 4th at 166). At trial, the jury was instructed pursuant to

CALCRIM 400, that "if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime." CT 1448. Based on this instruction, Petitioner argues that the jury was permitted to apply the natural and probable consequences doctrine of aider and abettor liability to Petitioner's first degree murder allegation, in violation of *Chiu*. Pet. m27-28. Petitioner then concludes that this error violated his constitutional rights. *Id.* at m29.

The superior court found this claim to be without merit as follows:

> *Chiu* held that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine; rather, liability for this crime must be based on direct aiding and abetting principles. The remedy in such a situation where the defendant has been convicted of a crime based on his or her aiding and abetting a crime that is the natural and probable consequences of the target offense includes allowing the People to accept a reduction of the conviction to second degree murder, or, to retry the greater offense. 59 Cal. 4th at 168.
>
> In this case the jury was instructed on CALCRIM 400: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime . . . that person [is] the perpetrator. Two, he or she may have aided and abetted a perpetrator, who directly committed the crime. A person is [equally] guilty of the crime whether he or she committed it personally or aided and abetted the perpetrator who committed it. [Para.] Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime."
>
> Petitioner's present contention that the jury *could have convicted petitioner under the natural and probable consequences doctrine* because it was instructed with CALCRIM 400 is without merit. That doctrine is simply not part of the plain language of CALCRIM 400. It would be error for the jury to disregard the plain language of CALCRIM 400 by introducing or interposing a gloss of the natural and probable consequences doctrine.
>
> The jury also was instructed with CALCRIM 401, or "direct" aiding and abetting principles: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: 1. The perpetrator committed the crime; 2. The defendant knew that the perpetrator intended to commit the crime; 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; AND 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.
>
> "Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime.

"If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor.

"[If you conclude that defendant was present at the scene of the crime or failed to prevent the crime, you may consider that fact in determining whether that defendant was an aider and abettor. However, the fact that a person is present at the scene of a crime or fails to prevent the crime does not, by itself, make him or her an aider and abettor.]

"[A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed. To withdraw, a person must do two things: 1. He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating. The notification must be made early enough to prevent the commission of the crime. AND 2. He or she must do everything reasonably within his or her power to prevent the crime.

"The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw. If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory.]"

Thus, petitioner cannot claim the natural and probable consequences doctrine applies to CALCRIM 401 as CALCRIM 401 is focused on the question whether a direct aider and abettor of a crime can be convicted for a crime.

Finally, the jury was instructed on CALCRIM 520, murder with malice aforethought: "Each defendant is charged in Count One with murder in violation of Penal Code 187. To prove that the defendants are guilty of this crime, the People must prove that: 1. The defendant committed an act that caused the death of another person; AND 2. When the defendant acted, they had a state of mind called malice aforethought.

"There are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder.

"The defendants acted with express malice if they unlawfully intended to kill.

"The defendants acted with implied malice if: 1. They intentionally committed an act; 2. The natural and probable consequences of the act were dangerous to human life; 3. At the time they acted, they knew their act was dangerous to human life; AND 4. They deliberately acted with conscious disregard for human life.

"Malice aforethought does not require hatred or ill will toward the victim. It is a mental state that must be formed before the act that causes death is committed. It does not require deliberation or the passage of any particular period of time.

"An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."

The natural and probable consequences doctrine in CALCRIM 502 is again not fashioned around aider and abettor culpability. Rather, the instruction concerns the direct culpability of the defendant.

Thus, the jury instructions in petitioner's case did not ask the jury to consider petitioner's culpability as an aider and abettor. For that reason, *Chiu* does not apply. Petitioner's claim to the contrary is without merit.

Superior Ct. Decision 2-5

The state superior court's denial of habeas relief on this ground was not contrary to or an unreasonable application of clearly established federal law. Petitioner has identified no clearly established federal law holding that an aider and abettor may not be convicted of first degree premeditated murder under the natural and probable consequences doctrine. Like Petitioner's claim relying on the California Supreme Court ruling in *Elizalde* above, Petitioner's claim here relying on *Chiu*, another California Supreme Court ruling, cannot entitle him to federal habeas relief. *See Wilson*, 562 U.S. at 5 ("But it is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts") (italics in original).

Although Petitioner argues that the alleged error is a structural error, neither the Supreme Court nor the Ninth Circuit has declared this type of error as a structural error. Only in the narrow circumstances where the jury instructions for crimes were based on facially invalid or legally impossible theories, or "non-existent" crimes, would the federal habeas reviewing courts consider the error to be a structural one. *Evanchyk v. Stewart*, 340 F.3d 933, 940 n.2 (9th Cir. 2003); *cf. Suniga v. Bunnell*, 998 F.2d 664, 667-68 (9th Cir. 1993) (finding instruction on felony murder infected the whole trial because the prosecution never relied on a felony-murder theory). In the majority of cases where a due process violation is alleged based on a deficient jury instruction, that type of error is typically subject to harmless error review. *See Evanchyk*, 340 F.3d at 940 (holding that while "it is a due process violation for jury instructions to omit an essential element of a crime, that is a type of error which is subject to harmless error review"). Petitioner proffers no reasons as to why the alleged instruction error was facially invalid or based on legally impossible theories. Accordingly, the jury instruction at issue is at best a "trial error" and would be subject to a harmless error analysis. *Chapman v. California*, 386 U.S. 18, 22 (1967).

In cases where a petitioner alleges that the instruction was erroneous, it is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Estelle v. McGuire*, 502 U.S. 62, 72

1   (1991) (citation omitted).  Federal courts would also inquire "whether there is a reasonable

2   likelihood that the jury has applied the challenged instruction in a way" that violates the

3   Constitution.  *Id.*  The state superior court decision was consistent with these principles and

4   examined all the relevant jury instruction in addition to CALCRIM 400.  In contrast, Petitioner's

5   reliance on this final sentence of CALCRIM No. 400, in isolation from all other instructions in

6   support of his petition, fails to consider the instructions as a whole and the trial record.  20 RT

7   3717; Pet. m27.  As the state superior court noted, while the jury received CALCRIM No. 400 that

8   explained the basic principles of aider and abettor liability, CALCRIM No. 401 also expanded on

9   those principles for "intended crimes."

10      In fact, the trial court instructed the jury on how to "decide whether it is murder of the first

11   or second degree," if they decided that the defendants had committed murder.  20 RT 3719.

12   Specifically, the instruction states that the prosecution has relied on the following three theories

13   for the first degree murder charge: (1) "willful, deliberate, and premeditated;" (2) "committed by

14   lying in wait;" or (3) committed by "discharging a firearm from a motor vehicle."  *See* 20 RT

15   3719-3720.  The elements of those three theories were explained by the relevant CALCRIM

16   instructions, and none of those instructions referred to the natural and probable consequences

17   doctrine.  *See* 20 RT 3718-3722.  In closing argument to the jury, the prosecutor asserted that all

18   of the elements of the three murder theories had been proven beyond a reasonable doubt,

19   emphasizing that "[t]his is a first degree murder case, plain and simple." 20 RT 3748.

20      Petitioner further argues that the trial court erred in failing to provide further instructions

21   on the natural and probable consequences doctrine set forth in CALCRIM Nos. 402 and 403, to

22   supplement CALCIM No. 400.  Traverse 7-8.  However, due process does not require that an

23   instruction be given unless the evidence supports it.  *See Hopper v. Evans*, 456 U.S. 605, 611

24   (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005).  Further, the omission of an

25   instruction is less likely to be prejudicial than a misstatement of the law.  *See Walker v. Endell*,

26   850 F.2d at 475-76 (citing *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977)).  Thus, a habeas

27   petitioner whose claim involves a failure to give a particular instruction bears an "'especially

28   heavy burden.'"  *Villafuerte v. Stewart*, 111 F.3d 616, 624 (9th Cir. 1997) (quoting *Henderson*,

431 U.S. at 155).

Petitioner fails to meet the heavy burden in showing that the failure to instruct the jury with CALCRIM Nos. 402 and 403 was a violation of due process. As noted above, the prosecution did not rely on the natural and probable consequences doctrine to support the first degree murder charge. There is also no reason to believe that the *absence* of those instructions on the natural and probable consequences doctrine, CALCRIM Nos. 402 and 403, would lead a jury to convict Petitioner of first degree murder based on the natural and probable consequences doctrine. When viewed in context of the explicit instructions directed to first degree murder and the trial record as a whole, the last sentence of CALCRIM No. 400, as relied upon by Petitioner, actually provided no basis for a verdict of first degree murder. As the state superior court recognized, the final sentence of CALCRIM No. 400 was merely a brief reference to aiding and abetting liability without explicitly mentioning the natural and probable consequences doctrine. *See also* 20 RT 3701 (instructing the jury that "Some of these instructions may not apply depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts").

In view of the foregoing discussion, the state superior court decision finding that *Chiu* did not apply was not unreasonable as the jury instructions and the trial record as a whole fail to show that Petitioner was convicted of first degree murder based on the aider and abettor liability under the natural and probable consequences doctrine. If there is no contravention of *Chui*, the issue of whether the alleged error was prejudicial is moot and the Court need not evaluate it. *Brecht*, 507 U.S. at 638.

## V.    CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be DENIED.

Further, a Certificate of Appealability is DENIED. *See* Rule 11(a) of the Rules Governing Section 2254 Cases. Petitioner has not made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

34

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED.**

Dated: June 19, 2017

BETH LABSON FREEMAN
United States District Judge